UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

SHARON CHASE, as Administratrix of the
Estate of NICOLE CARMEN,

        Plaintiff,

  v.

CORRECTIONAL MEDICAL CARE, INC.,
EMRE UMAR,
JANE DOE NUMBER ONE, the screening nurse for decedent, Nicole Carmen, employed by Correctional Medical Care, Inc., whose identity cannot presently be determined, JANE DOE NUMBER TWO, Head Nurse at the Schenectady County Jail, employed by Correctional Medical Care, Inc., whose identity cannot presently be determined, JOHN/JANE DOES 3-5, employees of Correctional Medical Care, Inc., whose identities cannot presently be determined, COUNTY OF SCHENECTADY, DOMINIC A. D'AGOSTINO, JIM BARRETT, and JOHN/JANE DOES 6-10, employees of the Schenectady County Sheriff's Department whose identities cannot presently be determined,

        Defendants.

**COMPLAINT**

Civil Action No.  1:14-CV-0474 (DNH/TWD)

**JURY TRIAL DEMANDED**

---

Plaintiff Sharon Chase, as Administratrix of the Estate of Nicole Carmen, by and through her attorneys, the Law Offices of Elmer Robert Keach, III, PC, complaining of Defendants, alleges as follows:

### JURISDICTION

1.    This Court has jurisdiction over this action under the provisions of 28 USC §§ 1331, 1341, & 1343 because it is filed to obtain compensatory and punitive damages for the

1

deprivation, under color of state law, of the rights of citizens of the United States secured by the Constitution and federal law pursuant to 42 USC § 1983.

2. Plaintiff Sharon Chase obtained Limited Letters of Administration on Behalf of the Estate of Nicole Carmen on February 21, 2014. As such, Sharon Chase is entitled to commence this action for the violation of civil rights on behalf of Nicole Carmen's Estate.

3. This Court also has supplemental jurisdiction over claims asserted in this action under New York State law pursuant to 28 U.S.C. § 1367. A timely Notice of Claim was filed in this action, with that Notice of Claim being amended upon the issuance of Limited Letters of Administration. The County of Schenectady subsequently conducted a Gen. Mun. Law Section 50-h hearing prior to the filing of this action.

4. Venue is proper under 28 USC § 1391 (b)(2) because the events giving rise to Plaintiff's claims occurred in this judicial district.

## **PARTIES**

5. Plaintiff Sharon Chase is a citizen of the United States and currently resides in Schenectady County.

6. Defendant Correctional Medical Care, Inc. is a corporation duly licensed to conduct business in the State of New York, with its principal place of business being 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania.

7. Defendant Emre Umar was and remains employed as the duly appointed President of Correctional Medical Care, Inc., with his principal place of business being 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania.

8. At all times relevant herein, and upon information and belief, Defendant Jane Doe Number One was employed by Correctional Medical Care, Inc., with her principal place of

business being 320 Veeder Ave, Schenectady, New York. Plaintiff cannot presently determine the identity of this individual, except to state that she was responsible for providing an initial medical screening for decedent Nicole Carmen on or about April 20, 2014.

9. At all times relevant herein, and upon information and belief, Defendant Jane Doe Number Two was employed by Correctional Medical Care, Inc., with her principal place of business being 320 Veeder Ave, Schenectady, New York. Plaintiff cannot presently determine the identity of this individual, except to say that she is employed as the "head nurse" at the Schenectady County Jail who was called to Nicole Carmen's housing unit on or about April 24, 2013.

10. At all times relevant herein, and upon information and belief, Defendants John/Jane Does 3-5 were employed by Correctional Medical Care, Inc., with their principal place of business being 320 Veeder Avenue, Schenectady, New York. Plaintiff cannot presently determine the identities of these individuals, except to say that they were employed as nurses or other medical providers at the Schenectady County Jail and were responsible to provide medical care to Nicole Carmen from April 20, 2013 until April 24, 2013.

11. Defendant County of Schenectady is a municipality duly incorporated under the laws of the State of New York, with its principal place of business being 620 State Street, Schenectady, New York.

12. Defendant Dominic D'Agostino was and remains employed as the duly appointed Sheriff of Schenectady County, with his principal place of business being 320 Veeder Ave, Schenectady, New York.

13. Defendant Jim Barrett was and remains employed as the duly appointed Jail Administrator of the Schenectady County Jail, with his principal place of business being 320 Veeder Avenue, Schenectady, New York.

14. At all times relevant herein, and upon information and belief, Defendants John and Jane Does 6-10 were employed by the Schenectady County Jail as Corrections Officers, with their principal place of business being 320 Veeder Ave, Schenectady, New York. Plaintiffs cannot presently determine the identity of these individuals except to say that these individuals were responsible for supervising Nicole Carmen during her time in the Schenectady County Jail from April 20, 2013 until April 24, 2013.

**FACTS**

15. On or about April 20, 2013, decedent, Nicole Carmen was admitted to the Schenectady County Jail for a parole violation.

16. Upon information and belief, Ms. Carmen was assessed by Jane Doe Number One during a routine medical screening provided to all detainees. Upon information and belief, Jane Doe Number One, is a nurse employed by Correctional Medical Care Inc., ("CMC"), a private company contracted by Schenectady County Jail to provide medical treatment to all detainees.

17. Upon information and belief, Ms. Carmen reported to Jane Doe Number One that she was a heroin addict who had recently been using up to six "bundles" of heroin daily. Upon information and belief, Ms. Carmen reported that she was not feeling well and expected to go through a difficult withdrawal given the significant amount of heroin she had been using. Ms. Carmen also made representations regarding her drug use to other inmates detained at the facility, and her concern about opiate withdrawal.

18.     Upon information and belief, CMC has several policies and procedures establishing a strict protocol for their employees to follow when an inmate reports that they have been using drugs. Upon information and belief, this protocol requires that an inmate reporting recent drug use be provided 24-hour supervision by Corrections Officers. This protocol also requires that Corrections Officers maintain a daily log detailing the inmate's behaviors and to contact medical staff if the officer observes the inmate experiencing symptoms or discomfort associated with opioid withdrawal.

19.     Upon information and belief, this protocol also requires that a nurse conduct a medical assessment of the inmate at least three times a day. This assessment includes but is not limited to checking the inmate's blood pressure, vitals, and inquiring whether the inmate is experiencing any symptoms or discomfort. Additionally, inmates suffering from opioid withdrawal are provided a range of medications which help alleviate anxiety, pain, nausea, diarrhea and vomiting including Vistaril, Motrin, Imodium, Phenergan, and/or Quinidine. Upon information and belief, in difficult cases, the inmate is required to hospitalized for medically supervised withdrawal.

20.     On the first day of her admission, Ms. Carmen reported to inmates that she was not feeling well because she was going through withdrawal. Ms. Carmen spent most of the day lying in bed and refusing to eat because she was feeling nauseous. Upon information and belief, and contrary to CMC's policy, Ms. Carmen was not medically assessed, did not receive any medication to alleviate her symptoms, and was not provided 24-hour supervision from a Corrections Officer on that day.

21.     On the second day of her admission, Ms. Carmen's symptoms drastically worsened. Several inmates observed Ms. Carmen frequently vomiting and defecating on herself,

her bedding, and on the floor. Several inmates also complained to Corrections Officers about the foul smell coming from Ms. Carmen's cell.

22. On at least one occasion that day, a female Corrections Officer attempted to help Ms. Carmen by mopping her cell and providing Ms. Carmen with new bedding and clothing. Upon information and belief, several Jane/John Doe Defendant Corrections Officers also observed Ms. Carmen in obvious distress but did not contact medical staff that day. In the alternative, the Jane/John Doe Corrections Officers contacted medical staff, who in turn refused to provide Ms. Carmen medical treatment. Upon information and belief, and contrary to CMC's policy, Ms. Carmen was not medically assessed, did not receive any medication to alleviate her symptoms, and was not provided 24-hour supervision from a Corrections Officer on that day.

23. On the third day of her admission, Ms. Carmen was summoned to the medical infirmary. Ms. Carmen was observed walking to infirmary in a sluggish manner and looked pale and sickly. Upon information and belief, medical staff conducted a cursory assessment of Ms. Carmen and sent her back to her cell without any medication or treatment. Even this cursory examination would have revealed that Nicole Carmen was in severe medical distress, and was clearly suffering from opiate withdrawal. After her return from the infirmary, Ms. Carmen was finally provided constant supervision from a Corrections Officer.

24. Throughout the day, Ms. Carmen was observed by several inmates and officers in a state of obvious distress. Ms. Carmen no longer could control her bowels and required several changes of clothing and bedding. The walls and floors of Ms. Carmen's cell were also covered with vomit, bile and feces. Ms. Carmen was also observed as incoherent and exhibiting jerking motions on the left side of her body, indicative of seizure activity.

25. In the afternoon, a female inmate housed on an adjacent tier, requested permission to help clean Ms. Carmen, who had remained covered in feces and vomit for several hours. Despite strict rules prohibiting contact between inmates on different tiers, Correction Officers gave this inmate permission to leave her cell and even provided the inmate with a mop, bucket, fresh clothing, and bedding for Ms. Carmen.

26. The female inmate then proceeded to wash feces and vomit from Ms. Carmen's body, the cell walls and floor. She also changed Ms. Carmen's bedding and clothing. This female inmate, who attempted to provide Ms. Carmen with clean underpants, observed Carmen having difficulty moving on one side of her body.

27. In the afternoon, and after receiving several complaints by inmates regarding Ms. Carmen's deteriorating condition, a Corrections Officer finally called the infirmary requesting immediate medical assistance for Mr. Carmen. This Corrections Officer informed the medical staff that an inmate was vomiting, defecating on herself, was unresponsive and exhibiting jerking movements on one side of her body.

28. Shortly thereafter, Jane Doe Number Two, who, upon information and belief, was the head nurse employed by CMC, responded to the call and assessed Ms. Carmen in her cell. After a cursory observation of Ms. Carmen, Jane Doe Number Two stated in words or substance that there was nothing wrong with Ms. Carmen and that she was "faking it" in order to be sent to the hospital where she could obtain more drugs. Jane Doe Number Two left Ms. Carmen's cell without providing any further medical treatment or even performing the basic steps of a nursing assessment.

29. Less than 24 hours later, Nicole Carmen left the facility on a stretcher and in a coma, having suffered a stroke, aneurism, and a lung infection - all known side-effects of untreated opiate withdrawal. Approximately five days later, Ms. Carmen was dead.

30. At the time of her death, Ms. Carmen was 39 years old with 3 children.

31. Upon information and belief, Correctional Medical Care, Inc., through express policy, practices or the inactions of its policy makers, had a policy and/or practice of not providing appropriate medical care to detainees at the Schenectady County Jail and many other local jails across the State of New York and the Commonwealth of Pennsylvania. This is evident given the numerous successful lawsuits and settlements that have been brought against CMC and the trail of deaths that follow whenever CMC is contracted to provide medical care for jail detainees. In fact, the Commission of Corrections has issued numerous scathing reports exposing CMC for their repeated failure to provide appropriate care to inmates including:

- Joaquin Rodriguez, Monroe County Jail – spent last five days of his life "seriously ill ... without medical care," representing "gross negligence and gross incompetence."

- Mildred Rios, Broome County Jail – Medical providers failed to follow policies resulting in death from heroin withdrawal.

- Maria Viera, Monroe County Jail – "inappropriate and inadequate credentialing," use of improperly trained and inexperienced nurse to perform initial assessment of detainee resulting in death from drug withdrawal.

- Richard Vandemark, Ulster County Jail – "Failure to provide a timely mental health assessment."

- Frederick Haag, Tioga County Jail - inappropriate and inadequate credentialing of medical providers and inappropriate supervision of inmate with serious medical condition resulting in death.

32. This is but a small sample of the numerous cases where CMC has exhibited gross negligence and deliberate indifference to the medical needs of detainees entrusted in their care by

8

jails across the country. *See* Alysia Santo, *Inmates Die in Cost Cut: State Investigators Cite a Pattern of Inadequate Health Care Provided by For-Profit Companies at Jails,* Albany Times Union, Monday, April 1, 2013. (Exhibit A). The Commission of Correction was so concerned about the performance of CMC that it recommended to several counties that they terminate their contract, and further requested that the New York State Department of Education, Office of the Professions, take action against the company.

33. Several of the reports of the Commission of Corrections address situations similar to those present here. Specifically, the Commission of Corrections, as well as some Federal courts, has addressed prior instances where employees of Correctional Medical Care have failed to follow the company's detoxification policies, or where those detoxification policies and practices have been found to be inadequate. The Plaintiff does not believe this repeated failure is anything but an intentional practice of CMC, as CMC provides no formal training regarding these policies, and also fails to provide properly trained personnel to fill the role of nurses who are responsible to determine the need for detoxification. Furthermore, medicine for drug withdrawal, and possible hospitalization for inmates, affects CMC's profit margin, as detailed below.

34. Upon information and belief, one reason why Nicole Carmen failed to receive adequate medical treatment was because of concerns by CMC and their employees regarding the expenses involved in properly caring for her and other detainees. In fact, CMC's contract with the County of Schenectady and other jails provides a clear incentive to provide as little treatment as possible to detainees because any medical expense directly reduces CMC's profit margins. Specifically, CMC's contract is "all inclusive," in the sense that all medical expenses to be paid for the care of patients in a local jail comes out of CMC's contract budget, including medication

and outside medical trips that do not involve catastrophic injuries. Consequently, every dollar that CMC spends providing care to inmates directly affects their profit margin, providing a direct incentive to provide inadequate medical care to inmates. Hence why CMC's pattern of deliberate indifference toward inmate medical needs, as detailed above, and its repeated failures to care for inmates who are suffering for withdrawal, also as detailed above, continue unabated across two states, leading to a number of deaths. In short, inmates in CMC facilities, including Nicole Carmen, have died because of CMC's interest in maximizing profits at the expense of patient care.

35.     Regardless of this pattern of misconduct, Nicole Carmen would likely be alive today had she received adequate medical treatment and supervision for opiate withdrawal.

36.     Furthermore, Schenectady County knew, or should have known, of CMC's pattern of misconduct and medical neglect at the time it contracted to hire CMC to provide medical care at the Schenectady County Jail. Despite the death of Nicole Carmen, the deaths of other CMC patients, and pronouncements from the New York State Commission of Correction criticizing CMC's conduct, Schenectady County Attorney Christopher Gardner referred to CMC as the "best" company the County has ever hired to address medical care at the Schenectady County Jail. While the Plaintiff questions what conduct justifies this pronouncement other than cost, Schenectady County, and its policy making officials, do not get to turn their back on the needs of detainees for whom they are responsible to care and hire a company to provide medical care that they know will provide inadequate, grossly negligent care.

37.     At all times relevant herein, the Defendants were acting under color of state law, that is, under color of the Constitution, statutes, laws, charters, ordinances, rules, regulations,

customs, and usages of the State of New York, Schenectady County, and Correctional Medical Care, Inc.

38.  The Defendants either knew or should have known that their actions violated clearly established law protecting the Constitutional and statutory rights of the Decedent.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS JANE DOE NUMBER 1, JANE DOE NUMBER 2, JOHN/JANE DOES 3-5, JOHN/JANE DOES 6-10 AND CORRECTIONAL MEDICAL CARE, INC.

**Violation of Constitutional Rights under Color of State Law
-- Deliberate Indifference to Serious Medical Needs--**

39.  Plaintiff incorporates by reference and realleges each and every allegation stated in paragraphs 1 through 38.

40.  Under the Eighth Amendment to the United States Constitution, detainees held by government agencies have a right to be free from cruel and unusual punishment. Actions of government officials or other state actors demonstrating deliberate indifference to the serious medical needs of detainees represent cruel and unusual punishment.

41.  The actions of the Defendants detailed above violated Nicole Carmen's rights under the United States Constitution. Specifically, it was not objectively reasonable for the Defendants to ignore Nicole Carmen's serious medical problems and refuse to provide her with appropriate supervision and necessary medical treatment, including medically supervised detoxification. In fact, the Defendants' actions demonstrate a deliberate indifference to Ms. Carmen's serious medical needs.

42.  All of the individual defendants were acting in their capacity as either Corrections Officers, Corrections Supervisors, or Medical staff at the Schenectady County Jail and therefore

11

acting under the color of state law. Their actions and inactions also represent a violation of 42 U.S.C. § 1983.

43. Given that Correctional Medical Care, Inc. is fulfilling a traditional governmental function, but is a private profit making company, it is not entitled to the protections afforded to municipal defendants. Instead, it is vicariously liable for the deliberately indifferent actions and inactions of its employees.

44. As a direct and proximate result of the unconstitutional acts described above, Nicole Carmen suffered tremendously in horrific conditions and ultimately died. The Plaintiff specifically demands the imposition of damages for Nicole Carmen's loss of life.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS THE COUNTY OF SCHENECTADY, CORRECTIONAL MEDICAL CARE INC., DOMINIC D'AGOSTINO, JIM BARRETT AND EMRE UMAR**

**--Violation of Constitutional Rights under Color of State Law--
Implementation of Municipal Policies and Practices that Directly Violate Constitutional Rights and/or Failure to Implement Municipal Policies to Avoid Constitutional Deprivations**

45. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 44.

46. Upon information and belief, Defendants County of Schenectady, Correctional Medical Care, Inc., Dominic D'Agostino, Jim Barrett, and Emre Umar are responsible for establishing policies and procedures to be utilized by CMC employees, and the employees of the Schenectady County Jail.

47. Upon information and belief, these defendants knew or should have known that detainees in the jail were not receiving appropriate medical treatment. This is evident given the publicity surrounding deaths and injuries at other CMC facilities, and deaths, especially those

related to opioid withdrawals, at the Schenectady County Jail and other facilities. It is well established that county jails must have appropriate policies in place to ensure that detainees receive treatment for serious medical needs, and county governments will not be relieved of that responsibility by hiring private medical contractors to fulfill those duties. It is also clear that Schenectady County and CMC did not have adequate policies and procedures in place given the horrific and heartless manner in which Nicole Carmen died at the Schenectady County Jail.

48. These practices were particularly pronounced and known to the administrators of Correctional Medical Care, including Emre Umar. CMC has a long pattern and practice of failing to provide adequate medical care to detainees who are suffering from drug and/or alcohol withdrawal, which has led to the deaths of numerous inmates. The response from CMC is to do nothing, including failing to provide adequate training and supervision to its subordinates to avoid the continuing, and unnecessary deaths, of inmates.

49. Correctional Medical Care and its employees were also operating under color of state law, in that Correctional Medical Care is performing a function traditionally reserved for state and/or municipal agencies, and as such is equally responsible for the violation of civil rights as if it is a state actor.

50. As such, the above-listed Defendants are directly responsible for this constitutional violation.

51. In the alternative, Defendants have instituted appropriate polices, but then through gross negligence and carelessness have demonstrated deliberate indifference to the constitutional rights of citizens by failing or intentionally refusing to enforce them.

52. These policies, procedures, and practices of the above-named Defendants violated the rights of Plaintiff Nicole Carmen.

53. As a direct and proximate result of the unconstitutional acts described above, Nicole Carmen suffered tremendously in horrific conditions and ultimately died. The Plaintiff specifically demands the imposition of damages for Nicole Carmen's loss of life.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS

**Violation of State Law**
**--Wrongful Death/Claim for Conscious Pain and Suffering--**

54. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 53.

55. The actions of the Defendants detailed above detailed above represent a claim for wrongful death under the laws of the State of New York. Specifically, the medical care provided to Nicole Carmen by the CMC Defendants was clearly negligent; in fact it was grossly so. The actions of Schenectady County and its various employees were also negligent in failing to more closely supervise Ms. Carmen when she exhibited obvious symptoms of opioid withdrawal.

56. The Plaintiff further asserts a claim for conscious pain and suffering against all Defendants, as well as a claim for loss of companionship for the children of Nicole Carmen.

57. Additionally, Defendant Schenectady County is directly responsible for the actions and inactions of its various employees taken in the scope of their employment, and is consequently directly responsible for Decedent Nicole Carmen wrongful death and conscious pain and suffering. Correctional Medical Care is similarly responsible for the conduct of its employees.

58. As a direct and proximate result of the illegal acts described above, Nicole Carmen was irreparably injured when she died.

**DEMAND FOR PUNITIVE DAMAGES**

59.     The actions and inactions of the Defendants detailed above, especially when considering the pattern of misconduct by Correctional Medical Care in causing the deaths of several detainees, are extreme and outrageous.  They also demonstrate a lack of empathy for the helpless, and contempt for the constitutional rights of those for whom they are charged to care.  An award of damages against these Defendants, including Correctional Medical Care, Inc., is appropriate.

60.     The Plaintiff does not, nor can they, seek an award of punitive damages against Defendant County of Schenectady.

**DEMAND FOR TRIAL BY JURY**

61.     The Plaintiff hereby demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff Sharon Chase requests that this Honorable Court grant her the following relief:

A.     A judgment in favor of Plaintiff against all Defendants for compensatory damages in an amount to be determined by a properly charged jury;

B.     A judgment in favor of Plaintiff against Defendants Correctional Medical Care, Inc., Emre Umar, Dominic A. D'Agostino, Jim Barrett, Jane Doe Number 1, Jane Doe Number 2, Jane/John Does 3-5, and Jane/John Does 6-10 for punitive damages in an amount to be determined by a properly charged jury;

C.     A monetary award for attorney's fees and the costs of this action, pursuant to 42 U.S.C. § 1988;

D. Any other relief that this Court finds to be just, proper and equitable.

Respectfully Submitted By:

/s Elmer Robert Keach, III

Dated: April 24, 2014

_____
Elmer Robert Keach, III, Esquire
Maria K. Dyson, Esquire
LAW OFFICES OF ELMER ROBERT
KEACH, III, PC
One Pine West Plaza, Suite 109
Albany, NY  12205
Telephone: 518.434.1718
Telecopier: 518.770.1558
Electronic Mail:
bobkeach@keachlawfirm.com

**ATTORNEYS FOR PLAINTIFF
SHARON CHASE, AS ADMINISTRATRIX OF
THE ESTATE OF NICOLE CARMEN**

# EXHIBIT A

**Inmates die in cost cut**
State investigators cite a pattern of inadequate health care provided by for-profit companies at jails
By Alysia Santo
Updated 7:21 am, Monday, April 1, 2013

*For more information about the cases, see: http://blog.timesunion.com/crime/documents-inmate-death-reports/13437/*

Three months in the Monroe County Jail turned into a death sentence for Joaquin Rodriguez, a diabetic.

He spent his final five days "seriously ill ... without medical care," despite the presence of Correctional Medical Care Inc., a for-profit company hired to provide health services to inmates at the Rochester jail.

The company has lucrative contracts at the county jails in Albany, Schenectady and Rensselaer counties and other facilities across New York.

CMC's care was "characterized by gross negligence and gross incompetence," wrote state investigators.

What happened to Rodriguez is part of a pattern. A Times Union review of reports from the medical review board of New York's Commission of Correction, which investigates inmate deaths, revealed repeated instances of inadequate care from CMC and other private prison health care businesses that currently operate in the state, or once did.

The commission has been sounding alarms about such companies — since at least 2001 — via its inmate death reports.

The corporate practice of medicine is illegal in New York. Medical companies must be owned and controlled by doctors, a regulation meant to keep business considerations from influencing medical decisions.

Yet for-profit medical companies have managed to not only exist in jail infirmaries, but thrive, by setting up "professional corporations," business entities run by medical professionals and positioned legally between the company and jails they serve.

This set up is a "front operation" and is "really just an arm of the business" said Assemblyman Richard Gottfried, chair of the Assembly Health Committee since 1987.

"The arrangement here seems to be a shell game that the law should not tolerate," Gottfried said.

It's an issue the state's corrections oversight commission raised in 2004, along with the state Education Department, when both agencies urged then-Attorney General Eliot Spitzer to stop a different company, Prison Health Services, from operating in New York, but his office declined to take any action.

Now the commission is raising the same concerns about CMC, and it's not just corporate legal procedure that's of concern.

In deaths across the state, investigators have discovered the same problems with corporate-run jail health care: Underqualified staff, ignored policies, unread patient records, and a lack of discipline for employee misconduct.

The dangers of for-profit health care "are especially serious behind bars" said Gottfried, since "there is little or no oversight" and "inmates are hardly a population that has a real voice."

As mistakes and misconduct repeat, inmates have continued to die unnecessarily.

The commission uncovered flawed care in the cases of every one of the 26 inmates whose death or suicide occurred under a private company's watch and spurred an investigation over the last five years of reports.

The medical review board does not do an in-depth investigation into every inmate death, but it does look at all suicides as well as deaths that happen subsequent to use of force, where there is evidence of neglect or medical mistakes, accidents, and whenever else there is doubt over cause or circumstance.

Nine of the reviewed deaths occurred among seven different jails with CMC contracts between 2009 and 2011.

At the conclusion of three death reports involving CMC, the commission recommended the state Education Department's Office of Professions, which oversees individual and business licenses, "inquire into whether CMC, Inc., a general business corporation, may lawfully hold itself out as a medical provider."

It's the same concern the commission warned the state Education Department about regarding PHS over a decade earlier.

At that time, the state Education Department requested the attorney general begin a criminal action against PHS, but the licensing agency's stance has since changed. Spokesperson Tom Dunn wrote in an email that PHS is now operating legally because "PHS no longer directly

provides medical services to jails" but rather uses a professional medical corporation for health services, and "only contracts with Prison Health Services for non-medical services, such as management and billing."

Education Commissioner John King declined an interview request.

Dunn would not answer any questions about CMC's license "because professional discipline investigations are confidential." He said "the state Education Department Office of Professions continues to work closely with the attorney general and when final agency actions have been taken they will be reported publicly."

The Commission of Correction also declined an interview request, but noted that their "concerns about whether contracted medical providers can legally operate in New York state have been well documented in the [death] reports," which, spokesperson Janine Kava wrote in an email, "speak for themselves."

CMC President Emre Umar wrote in an email that the company "offers its clients the highest level of professionalism, dedication and integrity" and "works diligently to implement all suggestions" made by the commission's medical review board. He noted that all CMC facilities "that have sought accreditation either from the National Commission on Correctional Health Care or the New York State Sheriff's Association, have achieved and maintained that accreditation."

Despite the disturbing history, services offered by these companies are an attractive sell for local governments looking to relieve themselves of the costly and chaotic responsibility of tending to medical and mental health needs of inmates.

Companies pitch themselves as experienced outfits that can recruit medical staff, maintain standards, and combat lawsuits, all for a set price.

They also donate money toward sheriff's elections.

CMC has contributed a total of $21,000 to the campaigns of sheriffs in seven New York counties, and was a top contributor in the elections of both Albany County Sheriff Craig Apple, giving $4,100, and Rensselaer County Sheriff Jack Mahar, giving $3,000. Both sheriffs said vendors often donate and this had nothing to do with their decision to hire the company.

CMC's business is flourishing in New York, where it operates exclusively, although its headquarters are in Pennsylvania.

For the many jails that have come to rely on these companies, the revolving corporate door keeps turning.

CMC has accumulated many of its contracts with jails that had previously hired other companies. There are 16 county jails in New York that use contracted providers for medical or mental health services, leaving out New York City, and 13 of those are with CMC.

The most recent CMC client is the Rensselaer County Jail, which hired the firm for the jail's first privatization of health services this March for a little under $2 million per year for three years.

Albany and Schenectady county jails both have multimillion-dollar contracts with CMC. Previously, Albany did business with similarly named Correctional Medical Services, and before that, both Schenectady and Albany were with PHS, as were other county jails.

Rensselaer County Sheriff Mahar said he asked other sheriffs about the company and "did not get one negative comment." He said he'd never heard about the commission's concerns about CMC. "Would it have changed our minds? I don't know."

That's because providing this service through the county was becoming exceedingly difficult, and local leaders saw privatization as a possible solution, Mahar said.

Schenectady County Attorney Chris Gardner described CMC as "the best company we've ever worked with."

Albany County Sheriff Craig Apple said he's "very comfortable" with CMC, and said they recently honored the company at a reception after they helped save two people's lives at the jail last year. "That's the kind of stuff you don't hear about," Apple said.

Caring for inmates is tough; they are sicker and more dependent on drugs and alcohol than the general population, said Gloria Cooper, the health services administrator for CMC at the Albany County jail. She has worked in the facility since 2000, both under PHS and CMS.

When asked about the reports on flawed medical care at other jails, she said, "I think in a lot of places, it depends on who's working."

At the Broome County Jail, one former social worker, Kim McAndrew, says she spoke out about the company's treatment of inmates and employees, and lost her job for it.

She's filed a notice of claim against the county which alleges she was "forced to see 19 to 25" inmates on a regular basis, even though she could only reasonably manage seven or eight; that she and other non-medical staff kept track of inmates medications; and that CMC hired a mental health employee into the Broome County Jail that was unlicensed and had been terminated from Tioga County following an inmate suicide.

In an interview, McAndrew said she decided to speak out because she felt she could no longer "stand by and watch."

"I didn't feel good about myself anymore," said McAndrew.

McAndrew is being represented by Binghamton attorney Ronald Benjamin, who is also in the middle of litigation for the family of Alvin Rios, a husband and father of five who died in the Broome County Jail.

"He was a beautiful man with a heart of gold," said his widow, Mildred Rios, choking back tears. "He loved his kids."

Commission investigators found that the jail knew Rios was addicted to heroin, yet CMC failed to comply with its own intoxication and withdrawal policy.

A doctor later told investigators he "never touched the chart."

asanto@timesunion.com •518-454-5008 • @alysiasanto

**Read the full state reports on CMC and other companies in digital versions of this story.**

**Deaths on Correctional Medical Care's watch**

Richard Vandemark, 21, suicide, April 8, 2009, Ulster County Jail, "failure to provide a timely mental health assessment"

Kevin Schmitt, 50, suicide, Sept. 4 2009, Ulster County Jail, "assessment ... grossly incompetent, flagrantly substandard"

Joaquin Rodriguez, 60, diabetic ketoacidosis/pneumonia, Oct. 18, 2009, Monroe County Jail, "seek to terminate ... contract with [CMC] for cause."

Maria Viera, 53, myocarditis, Sept. 2, 2010, Monroe County Jail, "inadequate and inappropriate credentialing"

Justin McCue, 26, suicide, Sept. 23, 2010, Dutchess County Jail, "improper and inadequate mental health care and treatment"

Latisha Mason, 28, undetermined, Feb. 2, 2011, Schenectady County Jail, "failed to comport with their own policy"

Thomas Siewert, 51, suicide, Feb. 11, 2011, Dutchess County Jail, "egregious lapses of care"

Alvin Rios, 40, cardiac arrhythmia, July 20, 2011, Broome County Jail, "left ... in an emergent, life-threatening status without appropriate medical attention"

Frederick Haag, 41, suicide, Oct. 24, 2011, Tioga County Jail, "grossly inadequate mental health care"

Source: Commission of Correction

**Repeated warnings**

Records show the commission recommended the state Education Department investigate CMC three times between 2011 and 2012

"That the Office of Professions undertake an inquiry into the status of Correctional Medical Care, Inc., a Pennsylvania corporation, as a lawful medical practitioner in New York State" March 3, 2011 (from Kevin Schmitt report)

"undertake an inquiry into the status of [CMC] ... as a lawful medical practitioner ... operating in accordance with Education Law" March 18, 2011 (from Joaquin Rodriguez report)

"inquire into whether CMC, Inc., a general business corporation, may lawfully hold itself out as a medical care provider" June 19, 2012 (from Thomas Siewert report)

Source: Commission of Correction

For more information about the cases, see: http://blog.timesunion.com/crime/documents-inmate-death-reports/13437/