UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHARON CHASE, as Administratrix of the Estate of NICOLE CARMEN, | **COMPLAINT** |
| Plaintiff, | |
| v. | |
| THE COUNTY OF SCHENECTADY, CORRECTIONAL MEDICAL CARE, INC., EMRE UMAR, MARIA CARPIO, DOMINIC D'AGOSTINO, JIM BARRET, RUSSELL FRICKE, JEAN BRADT, JOAN KILLEEN, CRYSTAL TRYON, PATRICIA CRAFT, | Civil Action No. 1:14-cv-0474 [DNH/TWD] |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Sharon Chase, as Administratrix of the Estate of Nicole Carmen, by and through her attorneys, the Law Offices of Elmer Robert Keach, III, PC, complaining of Defendants, alleges as follows:

**JURISDICTION**

1. This Court has jurisdiction over this action under the provisions of 28 USC §§ 1331, 1341, & 1343 because it is filed to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of citizens of the United States secured by the Constitution and federal law pursuant to 42 USC § 1983.

2. Plaintiff Sharon Chase obtained Limited Letters of Administration on Behalf of the Estate of Nicole Carmen on February 21, 2014. As such, Sharon Chase is entitled to commence this action for the violation of civil rights on behalf of Nicole Carmen's Estate.

1

3. This Court also has supplemental jurisdiction over claims asserted in this action under New York State law pursuant to 28 U.S.C. § 1367. A timely Notice of Claim was filed in this action, with that Notice of Claim being amended upon the issuance of Limited Letters of Administration. The County of Schenectady subsequently conducted a Gen. Mun. Law Section 50-h hearing prior to the filing of this action.

4. Venue is proper under 28 USC § 1391 (b)(2) because the events giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

5. Plaintiff Sharon Chase is a citizen of the United States and currently resides in Schenectady County.

6. Defendant Correctional Medical Care, Inc. is a corporation duly licensed to conduct business in the State of New York, with its principal place of business being 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania.

7. Defendant Emre Umar was and remains employed as the duly appointed President of Correctional Medical Care, Inc., with his principal place of business being 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania.

8. Defendant Maria Carpio was and remains employed as the duly appointed Chief Executive Officer of Correctional Medical Care, Inc., with her principal place of business being 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania.

9. At all times relevant herein, Defendant Russell Fricke was employed as a physician by Correctional Medical Care at the Schenectady County Jail, with his principal place of business being 320 Veeder Ave, Schenectady, New York. Upon information and belief,

2

Defendant Russell Fricke was responsible for the training and/or supervision of the medical staff at the Schenectady County Jail.

10. At all times relevant herein, Defendant Jean Bradt was employed as a Nurse by Correctional Medical Care at the Schenectady County Jail, with her principal place of business being 320 Veeder Ave, Schenectady, New York.

11. At all times relevant herein, Defendant Joan Killeen was employed as a the Director of nursing by Correctional Medical Care at the Schenectady County Jail, with her principal place of business being 320 Veeder Ave, Schenectady, New York. Upon information and belief, Defendant Joan Killeen was responsible for establishing policies and procedures to be utilized by the medical staff at the Schenectady County Jail.

12. At all times relevant herein, Defendant Crystal Tryon was employed as a Physician's Assistant by Correctional Medical Care at the Schenectady County Jail, with her principal place of business being 320 Veeder Ave, Schenectady, New York.

13. At all times relevant herein, Defendant Patricia Craft was employed as a nurse by Correctional Medical Care at the Schenectady County Jail, with her principal place of business being 320 Veeder Ave, Schenectady, New York.

14. Defendant County of Schenectady is a municipality duly incorporated under the laws of the State of New York, with its principal place of business being 620 State Street, Schenectady, New York.

15. Defendant Dominic D'Agostino was and remains employed as the duly appointed Sheriff of Schenectady County, with his principal place of business being 320 Veeder Ave, Schenectady, New York.

16. Defendant Jim Barrett was and remains employed as the duly appointed Jail Administrator of the Schenectady County Jail, with his principal place of business being 320 Veeder Avenue, Schenectady, New York.

**FACTS**

17. On or about April 20, 2013, decedent, Nicole Carmen was admitted to the Schenectady County Jail for a parole violation.

18. Upon information and belief, Ms. Carmen was assessed by a nurse, Blythe Gieselera, during a routine medical screening provided to all detainees. Nurse Gieselera is employed by Correctional Medical Care Inc., ("CMC"), a private company contracted by Schenectady County Jail to provide medical treatment to all detainees.

19. Ms. Carmen reported to Nurse Gieselera that she was a heroin addict who routinely used approximately 2 "bundles" of heroin daily, among abusing other prescription medications including Lortab. Ms. Carmen also reported that she had taken 2 bundles of heroin and 40 milligrams of Lortab shortly before she was arrested. Ms. Carmen reported that she was not feeling well and expected to go through a difficult withdrawal given the significant amount of heroin she had been using. Ms. Carmen also made representations regarding her drug use to other inmates detained at the facility, and her concern about opiate withdrawal.

20. CMC has several policies and procedures establishing a protocol for their employees to follow when an inmate reports that they have been using drugs. Upon information and belief, this protocol requires that an inmate reporting recent drug use be provided 24-hour supervision by Corrections Officers. This protocol also requires that Corrections Officers

maintain a daily log detailing the inmate's behaviors and to contact medical staff if the officer observes the inmate experiencing symptoms or discomfort associated with opioid withdrawal.

21. Upon information and belief, this protocol also requires that a nurse conduct a medical assessment of the inmate at least three times a day. This assessment includes but is not limited to checking the inmate's blood pressure, vitals, and inquiring whether the inmate is experiencing any symptoms or discomfort. This protocol also requires the daily supervision of the detainee's case by a licensed physician. Additionally, inmates suffering from opioid withdrawal are provided a range of medications which help alleviate anxiety, pain, nausea, diarrhea and vomiting including Vistaril, Motrin, Imodium, Phenergan, and/or Quinidine. Upon information and belief, in difficult cases, the inmate is required to hospitalized for medically supervised withdrawal.

22. However, this protocol does not require the provision of Methadone, a medication routinely used by doctors to help individuals taper off of opiates. . Rather, upon information and belief, Correctional Medical Care made a conscious decision, based upon the expense of Methadone, to only provide it to pregnant detainees going through withdrawal. As a result, all non-pregnant detainees are forced to quit "cold turkey", an experience that often has fatal and/or catastrophic results.

23. On April 20, 2013 the first day of her admission, Ms. Carmen reported to inmates that she was not feeling well because she was going through withdrawal. Ms. Carmen spent most of the day lying in bed and refusing to eat because she was feeling nauseous. Upon information and belief, and contrary to CMC's policy, Ms. Carmen was not medically assessed, did not receive any medication to alleviate her symptoms, and was not provided 24-hour supervision from a Corrections Officer on that day.

24. On the second day of her admission, Ms. Carmen's symptoms drastically worsened. Several inmates observed Ms. Carmen frequently vomiting and defecating on herself, her bedding, and on the floor. Several inmates also complained to Corrections Officers about the foul smell coming from Ms. Carmen's cell. Defendant Nurse Joan Killen took Ms. Carmen's vitals throughout the second day and observed that she consistently had high blood pressure, an increased heart rate, had trouble breathing, was nauseous, and had diarrhea. Defendant Patricia Craft also observed Ms. Carmen on that day but did not take her vitals because she was too sick to comply.

25. Upon information and belief, these nurses were repeatedly approached by an inmate, Sonia Thomas, who was responsible for cleaning the housing tier. Sonia Thomas told the nurses that she had substantial experience helping individuals who were suffering from withdrawal. Ms. Thomas told the nurses that she believed Ms. Carmen was suffering far worse than is typical for an individual going through withdrawal. Ms. Thomas repeatedly requested that the nurses send Ms. Carmen to the hospital. However, the defendants responded, in words or substance, that Ms. Carmen was faking it and was just trying to go to the hospital to get more drugs. Upon information and belief, given Ms. Carmen's elevated vitals and other emergent medical symptoms, she should have been sent to a hospital immediately.

26. Despite Ms. Carmen exhibiting symptoms commonly associated with severe withdrawal, Defendants Killeen and Craft failed to refer her to the jail's physician, Defendant Russell Fricke. These defendants also failed to send Ms. Carmen to the hospital. In the alternative, these defendants contacted Dr. Fricke but he refused to evaluate Ms. Carmen and/or send her to the hospital.

27. On at least one occasion that day, a female Corrections Officer attempted to help Ms. Carmen by mopping her cell and providing Ms. Carmen with new bedding and clothing. Several corrections officers also allowed inmate Sonia Thomas to clean Ms. Carmen's cell. When cleaning her cell, Ms. Thomas observed a substantial amount of green bile and feces on the floor, the walls, and also observed Ms. Carmen covered in these fluids.

28. Upon information and belief, several Corrections Officers contacted medical staff, who in turn refused to provide Ms. Carmen medical treatment. Upon information and belief, and contrary to CMC's policy, Ms. Carmen was not provided with 24-hour supervision from a Corrections Officer on that day, nor was she evaluated by a licensed physician or sent to the hospital.

29. On the third day of her admission, Ms. Carmen was summoned to the medical infirmary. Ms. Carmen was observed walking to infirmary in a sluggish manner and looked pale and sickly. Upon information and belief, medical staff conducted a cursory assessment of Ms. Carmen and sent her back to her cell without appropriate medication or treatment. Even this cursory examination would have revealed that Nicole Carmen was in severe medical distress, and was clearly suffering from opiate withdrawal. After her return from the infirmary, Ms. Carmen was finally provided constant supervision from a Corrections Officer.

30. Throughout the day, Ms. Carmen was observed by several inmates and officers in a state of obvious distress. Ms. Carmen no longer could control her bowels and required several changes of clothing and bedding. The walls and floors of Ms. Carmen's cell were also covered with vomit, bile and feces. Ms. Carmen was also observed as incoherent and exhibiting jerking motions on the left side of her body, indicative of seizure activity.

31. In the afternoon, a female inmate housed on an adjacent tier, requested permission to help clean Ms. Carmen, who had remained covered in feces and vomit for several hours. Despite strict rules prohibiting contact between inmates on different tiers, Correction Officers gave this inmate permission to leave her cell and even provided the inmate with a mop, bucket, fresh clothing, and bedding for Ms. Carmen.

32. The female inmate then proceeded to wash feces and vomit from Ms. Carmen's body, the cell walls and floor. She also changed Ms. Carmen's bedding and clothing. This female inmate, who attempted to provide Ms. Carmen with clean underpants, observed Carmen having difficulty moving on one side of her body.

33. In the afternoon, and after receiving several complaints by inmates regarding Ms. Carmen's deteriorating condition, a Corrections Officer finally called the infirmary requesting immediate medical assistance for Mr. Carmen. This Corrections Officer informed the medical staff that an inmate was vomiting, defecating on herself, was unresponsive and exhibiting jerking movements on one side of her body.

34. Eventually, Sergeant Pelletier entered Ms. Carmen's cell and saw that was "soiled with feces and vomit". Sergeant Pelletier then called a medical emergency. Defendants Crystal Tryon and Joan Bradt, after being informed about Ms. Carmen's condition, instructed Defendant Joan Killeen to respond to Ms. Carmen's cell. Upon information and belief, Ms. Carmen told Defendant Killeen that she felt very sick and she needed to go to the hospital. Defendant Killeen took Ms. Carmen's vitals and observed that she had a fever, was sweating profusely, and covered in vomit and feces. Nevertheless, and upon information and belief, Defendant Killeen again told Sergeant Pelletier in words or substance that Ms. Carmen was faking her symptoms in order to go the hospital.

35. Defendant Carmen was evaluated two more times that day by Defendant Patricia Craft. Defendant Craft again observed Ms. Carmen profusely sweating, covered in vomit and diarrhea, with a fever, high blood pressure, elevated heart rate, and reduced oxygen saturation levels. Again, Ms. Carmen was not sent to the hospital or even evaluated by a physician.

36. Less than 24 hours later, Nicole Carmen left the facility on a stretcher and in a coma, having suffered a stroke, aneurism, and a lung infection - all known side-effects of untreated opiate withdrawal. Approximately five days later, Ms. Carmen was dead.

37. At the time of her death, Ms. Carmen was 39 years old with 3 children.

38. Upon information and belief, Correctional Medical Care, Inc., through express policy, practices or the inactions of its policy makers, had a policy and/or practice of not providing appropriate medical care to detainees at the Schenectady County Jail and many other local jails across the State of New York and the Commonwealth of Pennsylvania. This is evident given the numerous successful lawsuits and settlements that have been brought against CMC and the trail of deaths that follow whenever CMC is contracted to provide medical care for jail detainees. In fact, the Commission of Corrections has issued numerous scathing reports exposing CMC for their repeated failure to provide appropriate care to inmates including:

- Joaquin Rodriguez, Monroe County Jail – spent last five days of his life "seriously ill ... without medical care," representing "gross negligence and gross incompetence."

- Mildred Rios, Broome County Jail – Medical providers failed to follow policies resulting in death from heroin withdrawal.

- Maria Viera, Monroe County Jail – "inappropriate and inadequate credentialing," use of improperly trained and inexperienced nurse to perform initial assessment of detainee resulting in death from drug withdrawal.

- Richard Vandemark, Ulster County Jail – "Failure to provide a timely mental health assessment."

- Frederick Haag, Tioga County Jail - inappropriate and inadequate credentialing of medical providers and inappropriate supervision of inmate with serious medical condition resulting in death.

- Alvin Rios, Broome County Jail – Required Broome County Executive to "conduct an inquiry into the fitness of Correctional Medical Care, Inc. as a correctional medical care provider, specifically for its failure to implement ... policy and procedure....".

- Justin McCue, Dutchess County Jail – inmate committed suicide by hanging as a result of inadequate policies and procedures.

- Kevin Schmitt, Ulster County Jail – Inmate committed suicide after CMC failed to properly assess suicidal risk upon admission.

- Thomas Siewart, Dutchess County Jail – Inmate committed suicide after inadequate mental health assessment and treatment by CMC.

- Jason Quackenbush, Onondaga County Jail – Inmate suffered life threatening injuries and hospitalization for 44 days due to CMC's failure to provide adequate medical treatment.

- Latish Mason, Schenectady County Jail – directed CMC to ensure that their staff comply with their own policies and ensure that intoxicated inmates are seen by a physician immediately after their admission.

39. This is but a small sample of the numerous cases where CMC has exhibited gross negligence and deliberate indifference to the medical needs of detainees entrusted in their care by jails across the country. *See* Alysia Santo, *Inmates Die in Cost Cut: State Investigators Cite a Pattern of Inadequate Health Care Provided by For-Profit Companies at Jails,* Albany Times Union, Monday, April 1, 2013. The Commission of Correction was so concerned about the performance of CMC that it recommended to several counties that they terminate their contract, and further requested that the New York State Department of Education, Office of the Professions, take action against the company.

40. Several of the reports of the Commission of Corrections address situations similar to those present here. Specifically, the Commission of Corrections, as well as some Federal

courts, has addressed prior instances where employees of Correctional Medical Care have failed to follow the company's detoxification policies, or where those detoxification policies and practices have been found to be inadequate. The Plaintiff does not believe this repeated failure is anything but an intentional practice of CMC, as CMC provides no formal training regarding these policies, and also fails to provide properly trained personnel to fill the role of nurses who are responsible to determine the need for detoxification. Furthermore, medicine for drug withdrawal, and possible hospitalization for inmates, affects CMC's profit margin, as detailed below.

41. Upon information and belief, one reason why Nicole Carmen failed to receive adequate medical treatment was because of concerns by CMC and their employees regarding the expenses involved in properly caring for her and other detainees. In fact, CMC's contract with the County of Schenectady and other jails provides a clear incentive to provide as little treatment as possible to detainees because any medical expense directly reduces CMC's profit margins. Specifically, CMC's contract is "all inclusive," in the sense that all medical expenses to be paid for the care of patients in a local jail comes out of CMC's contract budget, including medication and outside medical trips that do not involve catastrophic injuries. Consequently, every dollar that CMC spends providing care to inmates directly affects their profit margin, providing a direct incentive to provide inadequate medical care to inmates. Hence why CMC's pattern of deliberate indifference toward inmate medical needs, as detailed above, and its repeated failures to care for inmates who are suffering for withdrawal, also as detailed above, continue unabated across two states, leading to a number of deaths. In short, inmates in CMC facilities, including Nicole Carmen, have died because of CMC's interest in maximizing profits at the expense of patient care.

42. This pattern was confirmed by the New York State Office of the Attorney General, who investigated CMC and required the company to sign a consent decree that made a number of damning admissions.

43. In his press release describing the settlement, Attorney General Schneiderman detailed that CMC's actions represented "substandard care and mismanagement," and that CMC was "shortchanging medical services" for detainees."

44. The settlement agreement further found that CMC employed "unlicensed and inexperienced staff; inadequate staffing; lack of adequate medical oversight; and failure to adhere to medical and administrative protocols and procedures" at CMC facilities. Settlement Agreement, p. 5 ¶11.

45. The settlement agreement also addressed CMC's failure to pay penalties imposed against them regarding their failure to staff the Monroe County Jail with appropriately qualified medical professionals. Settlement Agreement, p. 5 ¶21-28. The settlement agreement found that when the penalties were paid, they were paid to the office of the Monroe County Sheriff instead of the County Executive. Settlement Agreement, p. 5 ¶29. Upon information and belief, this conduct occurred at the Schenectady County Jail, in that penalties incurred by CMC for failure to employ appropriately qualified professional were paid to Sheriff Dominic D'Agostino instead of the County Executive. It goes without saying that receiving hundreds of thousands of dollars for his Department provides a clear financial incentive for Sheriff D'Agostino to look the other way while inmate medical care is ignored in the name of profit..

46. The Attorney General's Office, after conducting a review of 20 medical records at the Tioga County Jail, also found that CMC staff did not "make necessary referrals to a psychiatrist or physician" and that "not one of the medical records showed evidence of a

physician ... oversight, and that staff dispensed medications in the absence of medical orders." Settlement Agreement, p. 5 ¶10. Plaintiff believes that this is exactly what happened in this case, as the mortality review that was submitted to the Commission of Corrections for Nicole Carmen reflected that a physician had not evaluated Nicole Carmen at any point during her detention at the Schenectady County Jail. Rather, Plaintiff believes that all of the physician's orders---purportedly signed by Defendant Fricke---were actually done so by unqualified nurses, in the absence of any supervision of a licensed physician.

47. Upon information and belief, Correctional Medical Care, Inc., is currently on probation with the National Commission of Correctional Health Care ("NCCHC"). The NCCHC regulates the quality of health services provided in correctional facilities. This fact was known to Defendants Sherriff D'Agostino and Jim Barret before Nicole Carmen died given that the contract between Schenectady County and CMC requires CMC to take affirmative steps to improve the quality of their health care in order to address their probationary status. Upon information and belief, the reason why CMC is on probation with NCCHC is because of their chronic failure to provide adequate health care to detainees in all of their facilities.

48. Regardless of this pattern of misconduct, Nicole Carmen would likely be alive today had she received adequate medical treatment and supervision for opiate withdrawal.

49. Furthermore, Schenectady County knew, or should have known, of CMC's pattern of misconduct and medical neglect at the time it contracted to hire CMC to provide medical care at the Schenectady County Jail. Despite the death of Nicole Carmen, the deaths of other CMC patients, and pronouncements from the New York State Commission of Correction criticizing CMC's conduct, Schenectady County Attorney Christopher Gardner referred to CMC as the "best" company the County has ever hired to address medical care at the Schenectady

County Jail. While the Plaintiff questions what conduct justifies this pronouncement other than cost, Schenectady County, and its policy making officials, do not get to turn their back on the needs of detainees for whom they are responsible to care and hire a company to provide medical care that they know will provide inadequate, grossly negligent care.

50. At all times relevant herein, the Defendants were acting under color of state law, that is, under color of the Constitution, statutes, laws, charters, ordinances, rules, regulations, customs, and usages of the State of New York, Schenectady County, and Correctional Medical Care, Inc.

51. The Defendants either knew or should have known that their actions violated clearly established law protecting the Constitutional and statutory rights of the Decedent.

### CAUSES OF ACTION

**AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS CORRECTIONAL MEDICAL CARE, RUSSELL FRICKE, JEAN BRADT, JOAN KILLEEN, CRYSTAL TRYON, AND PATRICIA CRAFT**
**Violation of Constitutional Rights under Color of State Law**
**-- Deliberate Indifference to Serious Medical Needs--**

52. Plaintiff incorporates by reference and realleges each and every allegation stated herein.

53. Under the Eighth Amendment to the United States Constitution, detainees held by government agencies have a right to be free from cruel and unusual punishment. Actions of government officials or other state actors demonstrating deliberate indifference to the serious medical needs of detainees represent cruel and unusual punishment.

54. The actions of Defendants Joan Killeen and Patricia Craft detailed above violated Nicole Carmen's rights under the United States Constitution. Specifically, it was not objectively

reasonable for the Defendants, who directly observed Nicole Carmen, to refuse to provide her with appropriate supervision and necessary medical treatment, including referring her to a physician and/or a hospital. In fact, the Defendants' actions demonstrate a deliberate indifference to Ms. Carmen's serious medical needs.

55. The actions of Defendants Joan Bradt and Crystal Tryon detailed above violated Nicole Carmen's rights under the United States Constitution. Specifically, it was not objectively reasonable for the Defendants, who were repeatedly informed of Nicole Carmen's emergent medical condition, to refuse to provide her with appropriate supervision and necessary medical treatment, including referring her to a physician and/or a hospital. In fact, the Defendants' actions demonstrate a deliberate indifference to Ms. Carmen's serious medical needs.

56. The actions of Defendant Russell Fricke detailed above violated Nicole Carmen's rights under the United States Constitution. Specifically, it was not objectively reasonable for the Defendant, who, upon information and belief, was repeatedly informed about Nicole Carmen's emergent medical condition, to refuse to provide her with appropriate supervision and necessary medical treatment, including evaluating her and/or referring her to a hospital. In the alternative, it was not reasonable, and is in fact against New York State Law, for a physician to fail to supervise their subordinate nurses and a physician's assistant, especially given Plaintiff was in a state of medical distress. In fact, the Defendant's actions demonstrate a deliberate indifference to Ms. Carmen's serious medical needs.

57. All of the individual defendants were acting in their capacity as either Corrections Officers, Corrections Supervisors, or Medical staff at the Schenectady County Jail and therefore acting under the color of state law. Their actions and inactions also represent a violation of 42 U.S.C. § 1983.

58. Given that Correctional Medical Care, Inc. is fulfilling a traditional governmental function, but is a private profit making company, it is not entitled to the protections afforded to municipal defendants. Instead, it is vicariously liable for the deliberately indifferent actions and inactions of its employees.

59. As a direct and proximate result of the unconstitutional acts described above, Nicole Carmen suffered tremendously in horrific conditions and ultimately died. The Plaintiff specifically demands the imposition of damages for Nicole Carmen's loss of life.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS THE COUNTY OF SCHENECTADY, CORRECTIONAL MEDICAL CARE INC., DOMINIC D'AGOSTINO, JIM BARRETT, EMRE UMAR, MARIA CARPIO, RUSSELL FRICKE, and JOAN BRADT**

**--Violation of Constitutional Rights under Color of State Law--
Implementation of Municipal Policies and Practices that Directly Violate Constitutional Rights/ Failure to Implement Municipal Policies to Avoid Constitutional Deprivations and/or Failure to Train and Supervise Employees under Color of State Law--**

60. Plaintiff incorporates by reference and realleges each and every allegation stated herein.

61. Upon information and belief, Defendants County of Schenectady, Correctional Medical Care, Inc., Dominic D'Agostino, Jim Barrett, Emre Umar, Maria Carpio, Russell Fricke, and Joan Bradt are responsible for establishing policies and procedures to be utilized by CMC employees, and the employees of the Schenectady County Jail.

62. It is well established that county jails must have appropriate policies in place to ensure that detainees receive treatment for serious medical needs, and county governments will not be relieved of that responsibility by hiring private medical contractors to fulfill those duties. Given the allegations made herein, it is apparent that the Defendants failed to implement

appropriate policies, procedures, supervision and/or training regimens to address healthcare provided to detainees at the Schenectady County Jail. This is evident given the publicity surrounding deaths and injuries at other CMC facilities, and deaths, especially those related to opioid withdrawals, at the Schenectady County Jail and other facilities. This is also glaringly apparent given the settlement agreement and press release issued by the New York State Attorney General's Office regarding CMC's chronic failure to ensure detainees at their facilities receive appropriate medical treatment. It is also clear that Schenectady County and CMC did not have adequate policies and procedures in place given the horrific and heartless manner in which Nicole Carmen died at the Schenectady County Jail.

63. These practices were particularly pronounced and known to the administrators of Correctional Medical Care, including Emre Umar. CMC has a long pattern and practice of failing to provide adequate medical care to detainees who are suffering from drug and/or alcohol withdrawal, which has led to the deaths of numerous inmates. The response from CMC is to do nothing, including failing to provide adequate training and supervision to its subordinates to avoid the continuing, and unnecessary deaths, of inmates.

64. Correctional Medical Care and its employees were also operating under color of state law, in that Correctional Medical Care is performing a function traditionally reserved for state and/or municipal agencies, and as such is equally responsible for the violation of civil rights as if it is a state actor.

65. As such, the above-listed Defendants are directly responsible for this constitutional violation.

66. In the alternative, Defendants have instituted appropriate polices, but then through gross negligence and carelessness have demonstrated deliberate indifference to the constitutional rights of citizens by failing or intentionally refusing to enforce them.

67. These policies, procedures, and practices of the above-named Defendants violated the rights of Plaintiff Nicole Carmen.

68. As a direct and proximate result of the unconstitutional acts described above, Nicole Carmen suffered tremendously in horrific conditions and ultimately died. The Plaintiff specifically demands the imposition of damages for Nicole Carmen's loss of life.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS

**Violation of State Law**
**--Wrongful Death/Claim for Conscious Pain and Suffering--**

69. Plaintiff incorporates by reference and realleges each and every allegation as stated herein. .

70. The actions of the Defendants detailed above detailed above represent a claim for wrongful death under the laws of the State of New York. Specifically, the medical care provided to Nicole Carmen by the CMC Defendants was clearly negligent; in fact it was grossly so. The actions of Schenectady County and its various employees were also negligent in failing to more closely supervise Ms. Carmen when she exhibited obvious symptoms of opioid withdrawal.

71. The Plaintiff further asserts a claim for conscious pain and suffering against all Defendants, as well as a claim for loss of companionship for the children of Nicole Carmen.

72. Additionally, Defendant Schenectady County is directly responsible for the actions and inactions of its various employees taken in the scope of their employment, and is

consequently directly responsible for Decedent Nicole Carmen wrongful death and conscious pain and suffering. Correctional Medical Care is similarly responsible for the conduct of its employees.

73. As a direct and proximate result of the illegal acts described above, Nicole Carmen was irreparably injured when she died.

## DEMAND FOR PUNITIVE DAMAGES

74. The actions and inactions of the Defendants detailed above, especially when considering the pattern of misconduct by Correctional Medical Care in causing the deaths of several detainees, are extreme and outrageous. They also demonstrate a lack of empathy for the helpless, and contempt for the constitutional rights of those for whom they are charged to care. An award of damages against these Defendants, including Correctional Medical Care, Inc., is appropriate.

75. The Plaintiff does not, nor can they, seek an award of punitive damages against Defendant County of Schenectady.

## DEMAND FOR TRIAL BY JURY

76. The Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Sharon Chase requests that this Honorable Court grant her the following relief:

A. A judgment in favor of Plaintiff against all Defendants for compensatory damages in an amount to be determined by a properly charged jury;

B. A judgment in favor of Plaintiff against all Defendants, with the exception of Schenectady County, for punitive damages in an amount to be determined by a properly charged jury;

C. A monetary award for attorney's fees and the costs of this action, pursuant to 42 U.S.C. § 1988;

D. Any other relief that this Court finds to be just, proper and equitable.

Respectfully Submitted By:

/s Elmer Robert Keach, III

Dated: January 5, 2015

                                               
Elmer Robert Keach, III, Esquire
Maria K. Dyson, Esquire
LAW OFFICES OF ELMER ROBERT
KEACH, III, PC
One Pine West Plaza, Suite 109
Albany, NY 12205
Telephone: 518.434.1718
Telecopier: 518.770.1558
Electronic Mail:
bobkeach@keachlawfirm.com

**ATTORNEYS FOR PLAINTIFF
SHARON CHASE, AS ADMINISTRATRIX OF
THE ESTATE OF NICOLE CARMEN**